George DALE, Commissioner of Insurance for the State of Mississippi, in His Official Capacity as Receiver of Franklin Protective Life Insurance Company, Family Guaranty Life Insurance Company, and First National Life Insurance Company of America,

Anne B. Pope, Commissioner of Commerce and Insurance for the State of Tennessee, in Her Official Capacity as Receiver of Franklin American Life Insurance Company,

Keith Wenzel, Director of the Department of Insurance for the State of Missouri, in His Official Capacity as Receiver of International Financial Services Life Insurance Company,

Carroll Fisher, Insurance Commissioner for the State of Oklahoma, in His Official Capacity as Receiver of Farmers and Ranchers Life Insurance Company,

Mike Pickens, Insurance Commissioner for the State of Arkansas, in His Official Capacity as Receiver of Old Southwest Life Insurance Company Plaintiffs

v.

Martin FRANKEL, et al Defendants

No. CIV. A. 3:00CV359KLN.

United States District Court,
S.D. Mississippi,
Jackson Division.

Jan. 22, 2001.

Charles Greg Copeland, Robert C. Richardson, Ridgeland, MS, C. Philip Curley, Alan F. Curley, Cynthia H. Hyndman, Chicago, IL, N. Victoria Holladay, Memphis, TN, William W. Gibson, Nashville, TN, for Plaintiffs.

Thomas E. Royals, Jackson, MS, Jonathan L. Rosner, New York, NY, Gary Atnip, Brentwood, TN, for Defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendant Phillip Miller to dismiss pursuant to Rule 12(b)(2), (3) and (6) of the Federal Rules of Civil Procedure. By his motion, Miller seeks dismissal of the RICO claims in the complaint on substantive grounds, and has further moved to dismiss the complaint against him based on an alleged lack of personal jurisdiction and improper venue. Plaintiffs have responded in opposition to the motion and the court, having considered the memoranda of authorities submitted by the parties on each of the grounds for dismissal urged by Miller, concludes that his motion is without merit and should be denied.

*Facts:*

As characterized by plaintiffs, this case arises out of a scheme masterminded by Martin Frankel to "loot" more than $200 million from seven insurance companies. The plaintiffs are the Commissioners and Directors of the Departments of Insurance for the states of Mississippi, Tennessee, Missouri, Oklahoma and Arkansas, in their official capacities as the liquidators/receivers/rehabilitators of the seven insurance companies and the defendants are Martin Frankel, David Rosse, Karen Timmins, Phillip Miller, John Hackney, Gary Atnip and eighteen corporations, foundations or trusts alleged to have been involved in the scheme.

According to plaintiffs, Frankel's scheme to defraud the insurance companies began in 1991, lasted nearly ten years, involved the participation of dozens of co-conspirators and ultimately resulted in the insolvency of the insurance companies. The scheme, detailed in the complaint and plaintiffs' RICO statement, and as summa-

rized in plaintiffs' memorandum of authorities, generally worked as follows. Frankel obtained control of the insurance companies and once in control, placed his codefendants Hackney and Atnip in positions of authority as CEO and CFO, respectively. Those defendants then stole the insurance companies' money through a series of financial transactions. To commit their fraud without detection, Frankel created sham companies, used alias identities and had numerous mailing addresses for phony companies and identities. These defendants transferred the money from the insurance companies to banks or brokerage houses in the United States and from there, transferred the money to foreign banks, usually in Switzerland. They then transferred the money back to the United States where it was converted to untraceable cash for their own use and to fund their fraudulent scheme.

Miller, the movant, is related to David Rosse, who was Frankel's chief of security, and was introduced to Frankel by Rosse.

On March 24, 2000, Miller pled guilty to conspiracy to structure transactions to avoid currency reporting requirements,[1] and in so pleading, acknowledged, *inter alia*, that Frankel had approached him in mid–1998 and asked him to receive wire transfers into his business bank account which Miller would convert to cash for Frankel; that Miller agreed, and over a period of about nine months, received weekly wire transfers of money in increments of $10,000 from Frankel's bank accounts in Switzerland to Miller's bank account in the United States, and ultimately received approximately $330,000 in wire transfers during this period of time; that Miller and Frankel chose the amount of $10,000 for the transfers and for withdrawals of just under that amount to avoid currency reporting requirements; that upon receipt of each transfer, Miller withdrew $9,200 to $9,500 in cash which he then gave to an employee Frankel sent to retrieve it; and that Miller retained a portion of the money as his fee.[2]

1. Section 5313(a) of the Currency and Foreign Transactions Reporting Act requires that a domestic financial institution involved in a transaction for the payment, receipt or transfer of currency of more than $10,000, *see* 31 CFR § 103.22(a) (establishing the amount for reporting), must report the transaction to the government. 31 U.S.C. § 5313(a). To deter circumvention of this reporting requirement, Congress enacted an antistructuring provision, 31 U.S.C. § 5324, which provides:

> No person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction-... (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

See *Ratzlaf v. United States*, 510 U.S. 135, 139–40, 114 S.Ct. 655, 658, 126 L.Ed.2d 615 (1994).

2. During his guilty plea, the government attorney represented that if the case were to go to trial, the government was prepared to prove the following facts:

> Mr. Miller owned and operated a business located in Highland Industrial Park in Peekskill, New York. Among the businesses in operation at Highland Industrial Park is a self-storage business which leased storage building spaces. Mr. Frankel, through numerous nominal employees leased the storage spaces from Mr. Miller, and Mr. Miller was aware that the real party was Martin Frankel.
>
> Mr. Miller also maintained an office at that location, and after his arrival in Connecticut, David Rosse was permitted to maintain an office there and to receive mail, packages and shipments at the Highland Park address.
>
> In fact, on a weekly basis, or almost a weekly basis for several years, Mr. Rosse received tens of thousands in blank travelers' checks from Switzerland for eventual delivery to Martin Frankel. Mr. Miller was aware that these blank travelers' checks were being sent to Rosse for delivery to Martin Frankel....
>
> In approximately mid–1998, Mr. Frankel, at the urging of his bank in Switzerland and to avoid arousing the suspicion of others, stopped using blank travelers checks to pay the expenses of his own ongoing criminal enterprise.
>
> However, he still needed access to cash and needed to remain anonymous in his dealings. Therefore, at or about this time, he approached [Mr. Miller] and asked him to receive wire transfers into his business bank account, the majority of which would

*The Substantive RICO Count:*

■ The substantive RICO count of the complaint, appearing as the first claim, alleges a violation of 18 U.S.C. § 1962(c), which prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." To establish a violation of § 1962(c) the plaintiffs must prove (1) the existence of an enterprise that affects interstate or foreign commerce, (2) that the defendant was "employed by" or "associated with" the enterprise, (3) that the defendant participated in the conduct of the enterprise's affairs, and (4) that the participation was through "a pattern of racketeering activity." *United States v. Posada–Rios,* 158 F.3d 832, 855 (5th Cir.1998); *United States v. Erwin,* 793 F.2d 656, 670 (5th Cir.1986). As indicated *supra,* Miller has identified a number of bases upon which he contends this count fails to charge an actionable § 1962(c) claim against him. Specifically, he argues that the claims are "facially fatally flawed" in that (1) they do not plead fraud as to Miller with particularity; (2) they fail to allege Miller was "associated with" the enterprise; (3) they fail to allege Miller "conducted or participated in the conduct" of the enterprise; and (4) the facts alleged do not support a finding that

be converted to cash for delivery to Mr. Frankel.

This Defendant agreed, and, thereafter, from August 1998 through April of 1999, he received approximately $10,000 per week in wire transfers from Frankel's Swiss bank account. After each wire transfer, Mr. Miller would withdraw just under that amount, usually between 9,200 and $9,500 in cash.

Mr. Frankel then sent an employee from Connecticut to Mr. Miller to pick up the $9,200 delivery to Mr. Frankel. Almost without exception Mr. Frankel would send an employee to pick up for delivery back to himself. The 8 percent difference was retained by Mr. Miller as his fee for receiving

Miller's alleged conduct was "in furtherance" of the alleged scheme to defraud.

*Miller's Association With a RICO Enterprise:*

■ Among other grounds, Miller argues that the complaint fails to allege that he was "associated with" an alleged RICO enterprise. "For the purposes of RICO, the threshold showing of 'association' is not difficult to establish; it is satisfied by proof that the defendant was 'aware of at least the general existence of the enterprise named....'" *United States v. Parise,* 159 F.3d 790, 796 (3d Cir.1998) (quoting *United States v. Eufrasio,* 935 F.2d 553, 557 n. 29 (3d Cir.1991)). A defendant need only "know of the general nature of the enterprise and know that the enterprise extends beyond his individual role." *Id.* He need not have specific knowledge of every member and component of the enterprise. *United States v. Tocco,* 200 F.3d 401, 425 (6th Cir.2000). Among the several enterprises alleged in the complaint in this case is an association-in-fact enterprise comprised of numerous individuals and entities, including Miller. The complaint clearly alleges that Miller was aware of and associated with this association-in-fact enterprise through his relationships with Rosse and Frankel, and that he agreed to participate in money laundering/structuring transactions to assist in what he knew was a scheme to enrich Frankel and others. The allegations of his willing participation in the money launder-

and converting the monies to cash. As the Court is aware, cash transaction reports are required to be filed by financial institutions at banks for $10,000 or more. By choosing a figure of $10,00 for the wire transfer and receiving just under that amount in cash, Mr. Miller and Mr. Frankel were able to avoid the currency reporting requirements imposed on banks, therefore, avoiding inquiry of Mr. Miller or Mr. Frankel concerning the nature of the source of the funds.

In total, from August 1998 through April of 1999, Mr. Miller received approximately $330,000 in wire transfers, the majority of which was converted to cash for the delivery to Mr. Frankel.

ing process over an extended period of time (as evidenced by the transcript of his guilty plea), and of Miller's longstanding relationship with Rosse and Frankel (as also evidenced by the transcript of his guilty plea), are plainly sufficient from which to infer his knowledge of and participation in the alleged scheme to defraud and thus to support a finding of his association with the alleged association-in-fact enterprise.[3]

*Miller's Participation in the Affairs of the Enterprise:*

■ Miller maintains that the complaint fails to sufficiently charge that he participated in the conduct of the affairs of the enterprise in accordance with the standards set by the Supreme Court in *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), and that for that reason, the RICO claim must be dismissed. In *Reves,* the Court held that "to conduct or participate directly or indirectly in the conduct of such enterprises' affairs" "one must participate in the operation or management of the enterprise itself," *Id.* at 185, 113 S.Ct. at 1173, and must "have some part in directing those affairs," *id.* at 179, 113 S.Ct. at 1170. In so holding, however, the Court noted that liability under § 1962(c) is not limited to upper management, and that the operation or management requirement will be satisfied "by lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184, 113 S.Ct. at 1173 ("An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."). The Court declined, though, to "decide how far § 1962(c) extends down the ladder

of operation." *Id.* at 184 n. 9, 113 S.Ct. at 1173 n. 9.

Citing *Reves,* Miller submits that because the complaint makes no allegation that he "directed" any part of the affairs of the alleged enterprise, then it does not sufficiently charge his participation in the conduct of the enterprise. But in the court's opinion, the allegations against him are sufficient in accordance with the Fifth Circuit's recent explication of the level of participation requisite to establish RICO liability against a lower-rung participant with a vertical connection to the enterprise.

In *United States v. Posada–Rios,* 158 F.3d 832 (5th Cir.1998), the Fifth Circuit opined that while evidence that a defendant exhibited "decision-making" power "would certainly be relevant to show that a defendant participated in the operation of an enterprise, *Reves* does not require it. *Reves* only requires that a defendant 'take part in' the operation of the enterprise, not that he direct its affairs." *Id.* at 856. The court distinguished *Reves* on the basis that it "involved a defendant with a 'horizontal' connection to the enterprise," whereas the case before it "present[ed] the 'vertical' question of how far RICO liability may extend 'down the organizational ladder,' " *id.;* and the court observed that in a multiple-level international drug enterprise such as the one it confronted, "the success of the enterprise depends upon many people who participate in the affairs of the enterprise at different levels, from the boss in Colombia through multiple levels of distributors to the retail dealers who sell to the ultimate users." *Id.* The court then applied the following test that it had earlier articulated in *United States v. Cauble,*

---

**3.** In his brief in support of his motion to dismiss, Miller argued that the complaint fails to satisfy the pleading requirements of Federal Rule of Civil Procedure 9 relating to pleading fraud with specificity. In his rebuttal submission, Miller purports to confine his arguments to "issues upon which it appears the dismissal motion may be disposed of"—and this issue is not included in the rebuttal, suggesting that Miller recognizes that this is not a basis for dismissal. The court nevertheless would note that in its opinion, the circumstances constituting fraud are alleged in the complaint with sufficient particularity, as is required by Rule 9(b); and the rule does not require that "[m]alice, intent, knowledge, and other condition of mind of a person" be averred other than generally.

706 F.2d 1322, 1332–33 (5th Cir.1983): "[A] defendant does not 'conduct' or 'participate in the conduct of an enterprise's affairs' unless (1) the defendant has in fact committed the racketeering acts as alleged, (2) the defendant's position in the enterprise facilitated his commission of the racketeering acts, and (3) the predicate acts had some effect on the enterprise." *Id.* (quoting *Cauble*). The allegations against Miller herein satisfy each of these elements.

A number of courts have similarly recognized that the level of participation that may result in RICO liability depends on the nature and configuration of the enterprise and the defendant's position in or connection to the enterprise, and consistent with the court's rationale in *Posada–Rios* have held that lower-rung participants who have "knowingly implemented management's decisions," thereby enabling the enterprise to achieve its goals, are liable. *MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.*, 62 F.3d 967, 978

(7th Cir.1995). *See also Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 n. 3 (1998) (7th Cir.1998) (holding that "lower rung" members of an alleged association-in-fact enterprise may be found liable "because they . . . knowingly implemented the decisions of upper management and thereby participated in the direction of the enterprise."); *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir.1994) (holding that a defendant may participate in the conduct of an enterprise "by knowingly implementing decisions, as well as by making them.").[4]

Based on the foregoing, the court finds no merit to Miller's assertion that the facts plaintiffs have alleged concerning him are not sufficient to support a conclusion that he "conducted or participated in the conduct" of the enterprise.

*Predicate Acts/Pattern of Racketeering Activity/Conduct "In Furtherance of" the Scheme to Defraud:*

■ Miller argues that the complaint fails to allege that he engaged in the pat-

---

4. Miller points to the statement by the court in *Goren v. New Vision International, Inc.*, 156 F.3d 721, 727 (7th Cir.1998), that "simply performing services for an enterprise, even with knowledge of the enterprise's illegal nature, is not enough to subject an individual to RICO liability under § 1962(c)," and he urges that this is in fact all he is alleged to have done. He fails to note, however, that the court in *Goren* went on to explain that where the defendant is alleged to be a member of an *association-in-fact* enterprise constituting a RICO enterprise—as is the case here—he need not have directed the affairs of the enterprise for the element of participation to be satisfied and need instead only have knowingly implemented the decisions of upper management. *Id.* at 727 n. 3. The court explained its reasoning in detail, stating:

The facts alleged in Ms. Goren's complaint are different from those we evaluated in *MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.*, 62 F,3d 967, 977–79 (7th Cir. 1995). In that case, the plaintiff alleged an "association-in-fact" enterprise consisting of several defendants and pursued RICO claims against "lower rung" members of the enterprise despite the fact that they had merely implemented the decisions of other members of the enterprise. The district court dismissed the claims against those

defendants because, in its view, they did not play any role in the direction of the enterprise. We reversed and held that the defendants could be held liable because they had knowingly implemented the decisions of upper management and thereby participated in the direction of the enterprise. In reaching that decision, we stressed that "[t]he primary fact leading us to this conclusion is the nature of the 'enterprise' [plaintiff] has depicted, as both [defendants] are alleged to be members of an 'association-in-fact' enterprise constituting the RICO enterprise." *Id.* at 979. In this case, by contrast, the enterprise alleged is New Vision, not an association-in-fact. Dr. Wallach, Direct and October are not alleged to be part of the enterprise and therefore cannot be said to conduct the affairs of the enterprise by implementing the decisions of upper management. Instead, these defendants are best characterized as contractors hired by the enterprise to perform specific tasks. *Id.* Clearly, the facts alleged in this case are like those in *MCM Partners* in the respects deemed relevant by the court in *Goren*. That is to say, under the *Goren* court's assessment of the relevant inquiry, since defendant is alleged to be a member of an association-in-fact enterprise, the element of participation is indeed satisfied if he knowingly implemented the decisions of upper management.

tern of racketeering activity conducted through the alleged enterprise. In this vein, he points out that the pleading alleges that the pattern of racketeering activity through which the RICO enterprise was allegedly conducted ·consisted of wire and mail fraud in furtherance of a scheme to defraud the insurance companies, and in particular,

> mailing or causing to be mailed ... false and fraudulent statements regarding the assets and investments ... [and] by causing insurance premiums, fees, funds and other assets of the Insurance Companies to be transferred, through the use of wire transfers ... to bank accounts ... maintained by, and/or held in the names and aliases of Defendants, and other persons known and unknown.

Miller reasons that he cannot incur liability under § 1962(c) since his alleged structuring offenses did not constitute all or any part of the pattern of racketeering through which the pleading alleges the enterprise was conducted. And in a related vein, he maintains that since his money laundering/structuring activities occurred after Frankel had already transferred the insurance companies' money to his Swiss bank accounts and had thereby obtained control of the money, then Miller's alleged conduct was not "in furtherance" of the alleged scheme to defraud, as it had already reached fruition before he became involved. *See Erwin*, 793 F.2d at 671 ("Racketeering activity alone does not violate RICO. Rather, the activity must further the affairs of the enterprise."). Having considered Miller's arguments, the court is not persuaded that dismissal is warranted on these grounds.

First, while the RICO count is largely focused on that alleged racketeering activity of the enterprises which resulted in the transfer of money *from* the insurance companies to Frankel's bank accounts, it is nevertheless evident from a reading of the complaint and RICO statement in *toto* that plaintiffs intended to include Miller's receipt of wire transfers and his structuring activities as predicate acts of wire fraud and currency structuring in connection with the scheme to defraud.[5]

Furthermore, and contrary to Miller's contention otherwise, it does not follow that Miller's activities could not have been in furtherance of the scheme to defraud simply because Frankel already had control of the funds in the Swiss bank accounts prior to Miller's money laundering/structuring activities. Indeed, the Fifth Circuit has specifically rejected "the proposition that acts occurring after the defrauding defendant already controls the proceeds of fraud ·may never further the fraud." *United States v. Allen*, 76 F.3d 1348, 1362 (5th Cir.1996) (citing *United States v. Bowman*, 783 F.2d 1192, 1197 (5th Cir.1986), in which the court stated, "[I]t is a well-established principle of mail fraud that use of the mails after the money is obtained may nevertheless be 'for the purpose of executing the fraud.'"); *see also United States v. Richards*, 204 F.3d 177, 211 (5th Cir.2000) (wire transfer of money which "was a distribution of proceeds from the fraudulent scheme" held to be in furtherance of the scheme and sufficient to sustain wire fraud conviction).

Here, it is apparent that plaintiffs have alleged that the purpose and/or goal of the scheme to defraud was not merely to "deplet[e] and depriv[e] the Insurance Companies of their assets" via the transfer of insurance company funds to Swiss bank accounts, but also for defendants to have use of the insurance companies' money. Indeed, the complaint specifically alleges that the money was intended to be "used to fund defendant Frankel's lifestyle and fraudulent operation, including the payment" of the other defendants. The money could not be so "used" if it remained in Swiss bank accounts. Moreover, at his

---

**5.** The court would note that 18 U.S.C. § 1961(1)(E) includes within the definition of "racketeering activity" "any act which is indictable under the Currency and Foreign Transactions Reporting Act."

plea hearing, the transcript of which is incorporated in the RICO Statement, Miller did not dispute the government's assertion that Frankel used the money from the Swiss accounts to pay the expenses of his own ongoing criminal enterprise, and that as part of the scheme, Frankel "needed access to cash and needed to remain anonymous in his dealings."[6] Given plaintiffs' allegations, the court concurs in plaintiffs' assessment that one could reasonably conclude that the wire transfers which Miller structured were in furtherance of the scheme to defraud the Insurance Companies by allowing money to be transferred out of the Swiss bank accounts to Frankel in a manner designed to evade detection by the banks and authorities. *Cf. Schmuck v. United States*, 489 U.S. 705, 712, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) (mailings which were "incident to an essential part of the scheme" to defraud were in furtherance of fraudulent scheme).[7]

*The RICO Conspiracy*

▮ With respect to plaintiffs' RICO conspiracy claim, Miller contends that "since the pleading fails to allege that he committed two predicate acts of mail or wire fraud, its RICO conspiracy claim is also facially flawed in failing to allege his agreement to the commission of at least two predicate acts by other RICO 'persons'." To establish a RICO conspiracy under § 1962(d), the plaintiffs must prove "(1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense."

*United States v. Sharpe*, 193 F.3d 852, 869 (5th Cir.1999). However, it is not necessary that the conspiracy be proven through direct evidence, and instead, "[t]he agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the 'development and collection of circumstances.'" *Posada–Rios*, 158 F.3d at 857. Moreover, "a defendant may be [found liable for] a conspiracy if the evidence shows that he only participated in one level of the conspiracy [alleged in the complaint] and only played a minor role in the conspiracy." *Id.* at 858. It is not necessary "to prove that the defendant knew all of the details of the unlawful enterprise or the number or identities of all the co-conspirators, as long as there is evidence from which the jury could reasonably infer that the defendant knowingly participated in some manner in the overall objective of the conspiracy." *Id.* In the court's view, the pleading herein easily satisfies these requirements. Simply put, the factual allegations set forth in the complaint and RICO statement, and further facts drawn from the plea transcript, are not merely conclusory, as Miller argues, and they are sufficient to support an inference of his knowledge of the conspiracy and its objective, and his participation in the conspiracy. Accordingly, his motion to dismiss the RICO conspiracy claim will be denied.

*Personal Jurisdiction and Venue:*

▮ Miller submits that as a New York resident with no contacts of any sort

---

**6.** *See supra* n. 2.

**7.** Regarding the two cases cited by Miller in support of his position, *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), and *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603, (1974), the Fifth Circuit has observed as follows:

In *Maze* [and] *Kann*, ... the mailings relied on by the government were made by individuals other than the defendants after the fraudulent schemes were completed. The defendants had cashed fraudulently obtained checks (Kann) ... or had used stolen credit cards (Maze) to obtain cash, merchandise or services. The banks or the businesses which provided the services then used the mails to settle their accounts with the credit card owners or the banks on which the checks were drawn. The Court held that in these circumstances the mailings were not sufficiently related to the defendants' schemes to support a finding that the mails were used "for the purpose of executing [the] scheme to defraud" within the terms of § 1341.

*United States v. Melvin*, 544 F.2d 767, 775 (5th Cir.1977). In contrast, Miller's activities do appear to bear the requisite relationship to the alleged scheme.

with the state of Mississippi, this court lacks personal jurisdiction over him and that because the plaintiffs have not alleged any facts from which to find that he or any of the defendants "resides, is found, has an agent, or transacts his affairs" in Mississippi, then the RICO claims are "not properly venued" against him under 18 U.S.C. § 1965(a).

RICO contains special venue and jurisdiction provisions, which state, in relevant part, as follows:

(A) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

.        .        .        .        .

(d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

Regarding § 1965(b), this court has explained that

This section was intended to enable a plaintiff to bring before a single court for trial all members of a nationwide RICO conspiracy. *Butcher's Union Local No. 498, United Food and Commercial Workers v. SDC Inv., Inc.*, 788 F.2d 535 (9th Cir.1986); *see also Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 672 (7th Cir.1987) (section 1965(b) authorizes nationwide service of process so at least one court will have jurisdiction over everyone connected with any RICO

enterprise), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 700 (1988). Thus, section 1965(b) effectively operates as a waiver of the applicable venue requirements if the "ends of justice" so require. And, by authorizing nationwide service of process, it operates in some cases to confer personal jurisdiction over defendants who would not otherwise be within the court's jurisdictional reach. *Anchor Glass Container Corp. v. Stand Energy Corp.,* 711 F.Supp. 325, 330 (S.D.Miss.1989). After noting that such "[p]rovisions in federal statutes for nationwide service of process have been held to provide a basis for the assertion of personal jurisdiction[,]" *id.,* and that "section 1965(b) [thus] creates personal jurisdiction by authorizing nationwide service of process[,]" *id.,* the court went on to explain that

[w]hile this section permits the assertion of personal jurisdiction, the due process clause of the fifth amendment represents a limit on a federal court's power to acquire personal jurisdiction by way of nationwide service of process; however, the rule in this circuit, as in most circuits, is that in a federal question case in which nationwide service is statutorily authorized, minimum contacts with the United States rather than with a particular state will satisfy the due process prong of the personal jurisdiction test.

. . .

*Id.* at 330 n. 10. Finally, as is pertinent here, the court observed that "[i]n addition to the requirement that there be one defendant properly before the court, another factor which favors the imposition of nationwide service under the RICO statute based on an 'ends of justice' finding is the lack of an alternative forum." *Id.* at 331.

■ In the case at bar, there is no question but that Miller has the requisite minimum contacts with the United States. Moreover, plaintiffs have at least made a prima facie showing that three of the defendants, Frankel, Hackney and Atnip, are

properly before the court in accordance with Mississippi's long-arm statute in that they committed at least a part of their alleged frauds, conversions and fiduciary breaches in Mississippi,[8] and that in the course of doing so, had the requisite minimum contacts with Mississippi to satisfy due process.[9] Thus, particularly in view of Miller's failure to demonstrate (or even argue) that an alternative forum exists for this litigation,[10] the court rejects Miller's challenge to personal jurisdiction and venue.

*Conclusion:*

Based on the foregoing, it is ordered that Miller's motion to dismiss is denied.

**8.** Miss.Code Ann. § 13–3–57, the long-arm statute, provides:

> Any nonresident person ... who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident or nonresident, or who shall do any business or perform any character of work or service in this state, shall by such act or acts be deemed to be doing business in Mississippi and shall thereby be subjected to the jurisdiction of the courts of this state.

**9.** Miller acknowledges, if only implicitly, that under the pertinent venue/jurisdiction provisions, if any defendant were properly before the court, then the "ends of justice" provision of § 1965(b) could be utilized to include other defendants, including him, in this action. His position, as the court understands it, is not that facts do not exist that would warrant the conclusion that one or more defendants are properly before the court but rather that the plaintiffs have not specifically pled these facts. The court, however, is aware of no requirement that plaintiffs specifically plead all the facts that are potentially relevant to venue and jurisdiction. It is sufficient that they generally identify the basis for venue and jurisdiction and that, if and/or when venue or jurisdiction is challenged, they then adduce the relevant facts. In any event, the plaintiffs have alleged facts relative to the contacts of Frankel, Hackney and Atnip with Mississippi which would support an exercise of personal jurisdiction over them.

**10.** *See Preway, Inc. v. Touche Ross & Co.,* No. 85–C–645–C, 1986 WL 69193, at *14 (W.D.Wis. March 14, 1986) (noting that "the better practice [is] to place the burden on the moving party to show that some such jurisdiction does, in fact, exist. Otherwise, plaintiffs will be left with the unenviable, if not impossible, task of proving a negative proposition.").